UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F I L E D
MAY 1 0 2006
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 05-340-GWU

DONALD L. PENNINGTON, PLAINTIFF,

VS. **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

Donald Pennington filed his original application for DIB in August, 2001 (Tr. 45-7) alleging disability due to a lung condition and hypertension (Tr. 51). The application was denied through the level of the Appeals Council, and Mr. Pennington appealed to this Court. After a period of reconsideration prompted by the undersigned's Memorandum Opinion, Order and Judgment of March 3, 2004 (Tr. 688-95), the case is once again before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991); Crouch v. Secretary of Health and Human Services, 909 F.2d 852, 855 (6th Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind

1

shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Crouch, 909 F.2d at 855.

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. Section 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process. Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986). An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless." Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human

2

Pennington

Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 CFR Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 CFR 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 CFR 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is

3

significant, the Commissioner may still use the rules as a framework for decision-making, 20 CFR Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The focus of the Court's concern in the 2004 remand was an indication from Mr. Pennington's treating physician, Dr. Anita Cornett, that he was "impaired" after an EKG in October, 2001, although the stress test was also said to be negative for myocardial ischemia and cardiac arrhythmia. (Tr. 180). Although the Court recognized that the note from Dr. Cornett was "not entirely clear" (Tr. 695), the case was remanded for clarification in view of the fact that the Administrative Law Judge (ALJ) had found that the plaintiff did not even have a "severe" impairment, and had stopped his inquiry at Step Three of the Garner analysis. (Tr. 694-5).

4

Pennington

On remand, the ALJ obtained testimony from a medical expert (ME), Dr. Richard Jackson, a board certified specialist in internal medicine. (Tr. 739). Dr. Jackson stated that the stress test in question had shown Mr. Pennington's blood pressure going up out of proportion to the amount of physical activity exerted because of deconditioning, and that Mr. Pennington had actually done fairly well. (Tr. 740-1). Because of this blood pressure response, Mr. Pennington would not be able to do vigorous, aerobic type of work unless he could gradually get back into shape, but Dr. Jackson did feel that Mr. Pennington would be able to lift 20 pounds occasionally and 10 pounds frequently, with the restrictions due to both limited lung capacity and high blood pressure. (Tr. 743). Mr. Pennington had chronic obstructive pulmonary disease (COPD) which was moderately severe, albeit he was continuing to smoke, and he would need to avoid temperature and humidity extremes. (Tr. 744-5). There would be no postural limitations, and no limitations on manipulation or reaching, in the opinion of the expert. (Tr. 744).

As part of a subsequent DIB application which was consolidated on remand with the plaintiff's first application, the ALJ also obtained testimony from a psychological expert, Dr. Doug McKeown, who reviewed the evidence and concluded that the plaintiff's conditions of a social anxiety disorder and a major depressive disorder would not meet one of the Commissioner's Listings of Impairment, and provided a mental medical assessment, finding that Mr.

5

Pennington had no less than a fair, defined as "satisfactory," ability to make occupational, performance, and personal-social adjustments. (Tr. 675-6, 726-8).

The ALJ accepted the testimony of Doctors Jackson and McKeown, and presented a hypothetical question to a vocational expert (VE) asking whether a person of the plaintiff's age, education, and work experience could perform any jobs if he were limited to "light" level exertion, had to avoid vigorous aerobic activity, concentrated temperature extremes, wetness, humidity, dust, fumes, smoke, and chemicals, and would have no less than a "satisfactory" ability to make occupational, performance, and personal-social adjustments. (Tr. 751). The VE responded that such a person would be able to return to the plaintiff's past relevant work as a security guard. (Id.). In the alternative, she named another position that such a person could perform, and proceeded to give the numbers in which it existed in the state and national economies. (Tr. 752).

On appeal, this Court must determine whether the administrative decision is supported by substantial evidence.

The plaintiff briefly challenges the ALJ's physical findings, noting that Dr. Roy Varghese, a physician who the counsel for the plaintiff calls a treating source, had limited Mr. Pennington to lifting less than 10 pounds occasionally in October, 2002. (Tr. 316-19). In addition, Dr. Varghese had limited the plaintiff to standing or walking for less than two hours in an eight-hour day, having a limited ability to push

6

and pull with both upper and lower extremities, "never" being able to perform any postural activities, and also having environmental restrictions. (Id.). However, there is little evidence that Dr. Varghese was a treating source, although the plaintiff was seen extensively by one of his colleagues, Dr. Mishra, at the same clinic from 2001 to 2003. (E.g. Tr. 549-81). One of a few office notes from Dr. Varghese is from February, 2001, and provides few objective findings, but indicates that the plaintiff's diagnoses were hypertension, chronic alcoholism, and tobacco abuse. (Tr. 592). In addition to Dr. Varghese's restrictions not being well supported by his own objective evidence, the subsequent evidence from Dr. Mishra indicates that, although the plaintiff had COPD, lumbar spondylosis with chronic lumbago, hypertension, and high cholesterol, he was, as of March, 2003, "doing fine" with smothering "off and on" and a clinically unremarkable examination. (Tr. 549). A consultative physical examination by Dr. Hughes Helm, also in March, 2003, revealed elevated blood pressure, but no other obvious impairments, other than a possible limitation on heavy exertional activities due to his lung problems. (Tr. 523-6).[1] Therefore, the ALJ had reasonable grounds to reject Dr. Varghese's restrictions, and the physical limitations in the hypothetical question are supported by substantial evidence.

---

[1] A pulmonary function test conducted at the same time showed a moderate obstruction and a possible restrictive defect, but the plaintiff admitted smoking one pack of cigarettes a day. (Tr 523, 529-31).

7

Pennington

The plaintiff also argues that the psychological restrictions in the hypothetical question are contradicted by a treating source. In this case, the plaintiff sought treatment from Dr. William H. Matthew, a psychiatrist, and a counselor at Dr. Matthew's clinic. The psychiatrist and counselor diagnosed a social anxiety disorder and a major depressive disorder, and gave a Global Assessment of Functioning (GAF) score in the 40s. (Tr. 301-2, 645, 648-9). A GAF score in this range reflects serious impairment in social, occupational, or school functioning. <u>Diagnostic and Statistical Manual of Mental Disorders</u> (Fourth Edition-Text Revision), p. 34. Dr. Matthew also prepared a mental medical assessment form in August, 2002, shortly after the start of Mr. Pennington's treatment in June, 2002, indicating that Mr. Pennington's depression, "lack of interest and motivation," would result in him having no useful ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, sustain ordinary routines without special supervision, complete a normal workday or workweek, perform at a consistent pace, travel in unfamiliar places, or use public transportation. (Tr. 517-18).

While conceding that the opinion of a treating physician is normally entitled to great weight, the ALJ rejected Dr. Matthew's restrictions, citing as offsetting factors the previously-mentioned testimony of Dr. McKeown, the psychological expert, an earlier assessment from a psychiatrist, Dr. Ashok Jain, in August, 2001,

8

at this level would be unable to maintain personal hygiene, since this reference work states that a person with a GAF between 11 and 20 would "occasionally" fail to maintain minimal personal hygiene and a person with a GAF between one and 10 would have a persistent inability to maintain personal hygiene. DSM-IV-TR, p.34. Therefore, it appears that the ALJ's conclusions regarding the GAF given by Dr. Matthew are not well supported.

Second, while the form prepared by the licensed clinical social worker does differ in some respects from the form signed by Dr. Matthew, even if it is assumed for the sake of argument they are exactly identical, there is no indication that the form did not reflect the psychiatrist's own opinion. Discrediting an opinion given by a treating source on the ground that it may have been prepared by a member of his staff is questionable at best, since it is hardly unusual for a busy professional to have clerical work performed by others.

Third, the ALJ's belief that the plaintiff had only one real stressor, unemployment, is belied by the treatment notes from Dr. Matthew's office, which reflect continued problems with the plaintiff's son, who was reportedly using drugs and alcohol and "causing family altercations" (Tr. 658) and with his wife, who reportedly was bipolar (Tr. 655). The plaintiff also described flashbacks from stressful situations on his former job as a security guard at a hospital, which had included a gunshot wound in the head at one point. (Tr 645, 647, 652). In

that the plaintiff had "moderate" major depression with a GAF of 85 (Tr. 482-3), and what the ALJ felt was inadequate support in Dr. Matthew's treatment notes for a GAF of 42. (Tr. 358). The ALJ stated that a GAF of 42 "if true, would require institutionalization," and that such a person would "be unable to dress, bathe, or toilet without assistance." (Id.). The ALJ asserted that the "multiple stressors" mentioned in the functional capacity assessment "are in fact only one: his being fired from his security guard job." (Id.). Furthermore, the ALJ appeared to discount Dr. Matthew's assessment on the grounds that it was initially prepared by a licensed clinical social worker in Dr. Matthew's office (Tr. 299-300), an unacceptable source under the Commissioner's regulations, and "the author sought to have it verified by more acceptable source, having it countersigned in August 2002" by Dr. Matthew. (Tr 358).

Regarding the effect of the GAF score, Dr. McKeown testified that a person with a GAF score in the 40s "would require quite intensive treatment and this is the type of individual you often find either in a transitional home or in a day treatment program, or, at the very least, in some type of therapeutic setting two or three times a week." (Tr. 726). The expert did not testify that such a person would definitely be institutionalized. No comment was made about the plaintiff's testimony that he could not afford more treatment as a possible explanation. (Tr. 749). Moreover, the DSM-IV-TR does not support the ALJ's assertion that a person with a GAF score

9

Pennington

December, 2002, the plaintiff's son was reportedly depressed and suicidal (TR 634), continued to drink in March, 2003 (Tr 627), and apparently made a suicide attempt in August, 2003 (Tr 622).[2] To summarize all of these stressors as being the result of a job layoff is questionable at best.

Essentially, against the specific restrictions and opinion of a treating psychiatrist, there is only the evidence by Dr. Jain of higher functioning in 2001[3] and the reports of state agency sources who did not examine the claimant. The most recent state agency reviewers were Psychologist H. Thompson Prout, who concluded on March 19, 2003 that the plaintiff's allegations were "somewhat credible, but not at marked levels of restriction." (Tr. 532). However, he gave "significant weight" to the prior ALJ's denial decision, rather than basing his opinion only on the newly-submitted records of mental health treatment. The second state agency psychologist affirmed Dr. Prout without additional discussion. (Tr. 599-600). Thus, their reports provide little help in overcoming a treating source opinion.

That leaves only Dr. McKeown. His testimony at the hearing was focused on his conclusion that the plaintiff did not meet a Listing. (Tr. 724-5). He recited a list

---

[2] At the January13, 2005 administrative hearing, Mr. Pennington testifed of increased anxiety and depression because "I had a son killed back in June[;i]t's been real rough to get through that." (Tr. 747.)

[3] The plaintiff questions the handwritten GAF of 85 by Dr. Jain, suggesting that it could have been written though to say 75 or even 65. (Tr. 483).

11

of functional restrictions, but without giving any clear explanation of why his opinion differed from that of the examining source. (Tr. 725-6). Apart from a suggestion that a person with a GAF in the 40s would require more intensive treatment than Mr. Pennington was receiving, and, apparently, assuming that there could be no legitimate explanation for someone with this level of functioning <u>not</u> receiving such treatment, Dr. McKeown simply listed his opinion of Mr. Pennington's restrictions without elaboration. Without a more detailed rationale, Dr. McKeown's opinion does not provide enough information to overcome the treating source opinion. See <u>Barker v. Shalala</u>, 40 F.3d 789, 794 (6th Cir. 1994).

The decision will be remanded for further consideration of the plaintiff's mental status.

This the __10__ day of May, 2006.

G. WIX UNTHANK
SENIOR JUDGE